Burke et al., Appellants, *v.* Hollinger.

512

Argued January 7, 1929. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*William N. Trinkle,* of *Bell, Trinkle, Truscott & Bell* and *A. H. Wintersteen,* with them, *Caroline K. Kenworthy, John Wintersteen, Frederick C. Newbourg, Jr.,* and *Henry W. Schorr,* for appellants.—Regardless of the manner of its construction or operation, a public garage in a residential neighborhood is, as matter of law, a nuisance per se and will be excluded therefrom: Mitchell v. Guaranty Corp., 283 Pa. 361; Ladner v. Siegel, 293 Pa. 306.

The circumstance that most of the people residing in that neighborhood made their homes in apartments and apartment houses, does not take the case out of the operation of the well recognized rule of law: Mitchell v. Guaranty Corp., 283 Pa. 361; Ladner v. Siegel, 293 Pa. 309; Satterthwait v. Gibbs, 288 Pa. 428; Ladies Decorative Art Club, 22 W. N. C. 75; Edmunds v. Duff, 280 Pa. 355; Krocker v. Planing Mill Co., 274 Pa. 143; Prendergast v. Walls, 257 Pa. 547; St. Luke's Church v. McShain, 29 Pa. Dist. R. 353.

The circumstance that this huge public garage to be built and operated on the Spruce Street front was to have no entrance on that front, and like considerations, does not justify its operation, the settled law being that it would be a nuisance per se "regardless of the manner of its construction or operation": Hohl v. Modell, 264 Pa. 516; Englander v. Apfelbaum, 56 Pa. Superior Ct. 145; Menendez v. Holt, 128 U. S. 514; Slingluff v. Tyson, 280 Pa. 206; Tyson v. Coder, 83 Pa. Superior Ct. 116.

*W. B. Saul,* of *Saul, Ewing, Remick & Saul,* for appellee.—The real question involved in this case concerns the application of the doctrine laid down by this court that a public garage operated in a residential neighborhood is a nuisance per se.

The argument on behalf of appellants ignores the fundamental rule that "each case depends largely on its own facts and where they are of doubtful import equity should not interfere": Mitchell v. Guaranty Corp., 283 Pa. 361, 364; Lesher v. Gassner Co., 285 Pa. 43.

This is not a new garage but an extension of an existing one.

OPINION BY MR. JUSTICE KEPHART, February 4, 1929:

Defendant extended to Spruce Street his five-story public garage located on the south side of Latimer Street between Fifteenth and Sixteenth Streets in Philadelphia. Plaintiffs brought this bill to enjoin operation of the extension as a public garage. The extension in the rear is 65 feet wide, 120 feet long and four stories high with basement. To preserve the present character of Spruce Street the first floor facing Spruce Street contains three rooms for use as stores, each of which has a depth of not less than sixty feet. It is stipulated that no part of the rooms will at any time be used for garage purposes. The balance of the first floor and the entire second, third and fourth floors are to be used as a garage.

The entrance to the garage is to remain on Latimer Street; there will be no entrance on Spruce Street and there is nothing in the actual design on the Spruce Street front that would suggest or indicate a place for storage of automobiles. In the new section no cars will be washed or repaired on any floor, the gases will be removed so as not to cause noticeable impurities in the air, and a solid wall is built on both sides of the building. When completed, the entire structure will be approximately 240 feet long from Latimer to Spruce Street and will house three hundred and fifty cars.

Spruce, Fifteenth and Sixteenth Street are among the principal thoroughfares in the city, the first running east and west, the latter two north and south. Latimer Street is a small street running east and west, north of Spruce Street, and mid-way between that street and Locust Street. Spruce Street from Eighth to Twenty-second was formerly an exclusively residential street, on which many of the most prominent families in Philadelphia resided. Today between Fifteenth and Sixteenth Streets it has lost its exclusively residential district character, as later explained, although, in a certain sense, it still remains predominantly residential; there are on this street, between Fifteenth and Sixteenth, an office building, two apartment houses, two restaurants, a gown shop, two real estate offices, hospital supply store, school of languages, doctor's offices, law office and a few residences used as private homes. On the east of defendants' lot is the private residence of Mrs. Riley and on the west the apartments of Mrs. Fitzpatrick, both plaintiffs. Spruce Street thus described now borders the steadily extending commercial district of Philadelphia, but there is no noisy business transacted on it between Fifteenth and Sixteenth Streets. Because of the approach of this commercial center, Spruce Street properties between these streets have steadily increased in value.

Latimer Street is used strictly for commercial purposes. The buildings in the rear of the properties fronting Spruce Street have been converted into garages, some of which are owned and rented by plaintiffs. On the lot from Latimer to Locust Streets is a large office building. Less than half a block away, at the corner of Fifteenth and Locust, are three large commercial office buildings, and on another corner is an apartment house. Under these facts, the court below refused to enjoin the extension, but laid down certain requirements as to operation; from this decree, plaintiffs appeal.

They insist that, inasmuch as the proposed addition was to be a public garage in a predominantly residential neighborhood, then, under settled law, it should be restrained as a nuisance per se regardless of its construction or operation. The fact that most of the people reside in apartment houses does not affect the situation, nor would the fact that ingress and egress is from a street used for commercial purposes, the locus in quo of the addition being in Spruce Street within a residential district.

We need not discuss the governing principles as to nuisance but refer to Pennsylvania Co., etc., et al. v. Sun Co., 290 Pa. 404, where they have been considered. The general theory as to the use of property may be stated as there laid down: "An owner has a right, barring malice and negligence, to any use of his property, unless by its continuous use he prevents his neighbors from enjoying the use of their property, to their damage." While this rule has undergone material modification under given conditions by legislatures and the courts in recent years, it still prevails as a general principle. The public garage business is a lawful one. A lawful business can never be a nuisance in fact or in anticipation, if it is carried on reasonably and with due regard for the health and peace of others: Rhoades v. Dunbar, 57 Pa. 274; Phillips v. Donaldson, 269 Pa.

244, 246. "Ordinarily, the complainant, asking relief, must establish that the proposed use will work some positive injury to his property......[and] the burden is upon him to show this as a fact before an injunction against its operation will be granted: George v. Goodovich, 288 Pa. 48": Ladner v. Siegel, 293 Pa. 306, 310. But "a given business is in itself a nuisance per se when it is generally known to be injurious to health and to cause legal damage to property in certain localities and surroundings, regardless of how it may be carried on. 'The common experience of mankind, of which the courts take judicial notice, has found, in certain localities and surroundings, certain pursuits to be universally injurious to health and damage to property, no matter how carefully conducted'": Pennsylvania Co., etc., v. Sun Co., supra, at 410. Though a public garage is not a nuisance in itself, yet it becomes such when conducted in a residential neighborhood: Prendergast v. Walls, 257 Pa. 547; Hohl v. Modell, 264 Pa. 516; Mitchell v. Guaranty Corp., 283 Pa. 361; Unger v. Edgewood Garage, 287 Pa. 14; Ladner v. Siegel, supra. The same is true of service (Slingluff v. Tyson, 280 Pa. 206) or filling stations: Carney v. Penn Oil Co., 291 Pa. 371. In these cases, the averment of the act, or an attempt to perform it in a place forbidden, is all that is necessary. But a public garage would not be a nuisance per se in a section devoted to business purposes. In the territory between the two zones, residential and commercial, there may be some uncertainty: Phillips et al v. Donaldson, supra; Unger v. Edgewood Garage, supra.

We must now consider the application of these principles to the facts found by the court below as narrated above. We have before the court a situation which requires, not a modification of our rules as announced in the previous cases, but a limitation of their effect in given localities under certain conditions. The rule that a public garage is a nuisance per se in a residential

district was first announced many years ago. It must be observed, without receding from this rule, that some of the reasons which prompted it have in different localities disappeared while others remain. In the early day we styled the accompaniments of a public garage to be: Noise, odor, danger, pounding metal, testing engines, speeding motors, smoke, danger to pedestrians, sounding of horn, danger to school children, as was pointed out in Prendergast v. Walls and succeeding cases. While these conditions still exist to some extent in public garages in small cities and boroughs, the public garage in large cities used for storage purposes does not have many of these distracting features. Improved machinery and the devotion of the building solely to storage have reduced many of the complaints. Another element of the rule involved the destruction of property value because of the nature of the business and the character of the building in which it is conducted. These must still be considered but only in relation to the particular locality affected.

We have never attempted to state what an exclusively or predominantly residential district should consist of, nor can it be accurately done. What is here suggested is the types of uses that may constitute a given district. In certain aspects these may control and by the uses stated not only may the application of the rule above announced in our decided cases be properly gauged but some idea may be given for future action.

A district composed of one-family dwellings, churches, library, with an occasional grocery store, doctors' and lawyers' offices in homes, would unquestionably compose an exclusively residential district; and such accessory uses as private garages, stables and necessary outbuildings for the comfort or enjoyment of the premises, would not affect its exclusive character. A second type of residential district, closely resembling the one referred to, but not so exclusive, is one having in addition to the above uses the following: double houses,

schools, public or private garden, with their accessory uses. In each of the foregoing classes our previously established rule as to public garages unquestionably applies.

A third type or class of residential districts combines the above, also houses used for tenements, flats, apartments of any character, hotels, boarding houses, fraternities, clubs, hospitals and the like. All of the above classes are predominantly residential, some more exclusively so than others, but, in the class last mentioned, it is apparent some buildings assume a commercial aspect. When considering our former cases, they fall under one or another of the above classes. For illustration, the Prendergast Case would be in the first or second class, as would also the Modell, Slingluff, George and Carney cases. In the third class would fall the Ladner and Mitchell cases, the latter from the viewpoint of locality being possibly the closest to the facts here presented. The ruling consideration in that case may safely rest on the principle that the decision of the chancellor, not being an abuse of discretion, is final. There were circumstances there mentioned which justified the order, the degree of proximity of near-by businesses and the danger to school children being prominent. (We have not considered the facts in cases such as Phillips v. Donaldson, 269 Pa. 244, and Hunter v. Wood, 277 Pa. 150, where building restrictions were involved.)

Despite the variations in the type of uses, because of the "home" or residence quality of the locality in each class, they are each entitled to the protection of the public garage rule. The square now before us has the general characteristics of districts of the third class, but its actual situation deprives it of the full protection of that rule. The properties of the two plaintiffs mentioned above border or are located on the fringe of a commercial district, that is, the immediate neighborhood is of a commercial character; either the latter breaks into the residential area in parts or is so close

520

that it overshadows the residential character. A commercial district in large cities includes stores, office buildings, apartment houses, newspaper plants, clubs, financial buildings, though it may exclude anything of an industrial or manufacturing nature, and also a noisy or dirt-making business. The district in this case is very close to the financial center of Philadelphia, to large office buildings, and other strictly commercial operations, one such being located on Spruce Street within the block. It is apparent that when a residential district of the type last described borders on a commercial district, it must bear the inevitable consequences of being located so close to a district of that character. In the determination of the question of nuisance, location and surroundings are of the first importance. The test is as to the immediate neighborhood and not remote districts: Krocker v. Westmoreland Planing Mill Co., 274 Pa. 143. Where business enterprises have invaded a residential locality, a different rule as to prohibition must be applied. The mere fact of annoyance from the conduct of a business does not establish the existence of a nuisance, and, hence, standing alone, it will not be a sufficient basis for an injunction against the particular use from which the alleged annoyance arises. One who lives in a city must bear with the inconveniences growing out of his location there, just as he enjoys the benefits flowing from it, even though the construction and use of a building may to some extent affect the personal comfort or preference of neighbors: Houghton v. Kendricks, 285 Pa. 223.

These principles are cited to make it clear that the manner of construction and operation of a public garage becomes important in determining, in certain districts, whether its use should be prohibited. Other important considerations make it necessary for an advance to be made in the law governing the use of buildings for public garages. Courts cannot stop progress; it must and will break through any judicially established principle,

as it must and will break through any law that impedes
its natural growth. Business progress is ever callous,
never grateful, and, as it goes forward, heeds neither
the weak nor the strong who may stand in the way.
It works to some extent insidiously and reckons not
the cost to others, but marches steadily on, injuring or
destroying what theretofore were considered the rights
of men with their properly cherished ideals, and possibly
disturbing peace and comfort; but from these sacrifices
the community as a whole prospers and is benefited.
This is called material progress of the world. It is use-
less to discuss what the future may do; the present
and past are sufficient for ordinary contemplation. One
single instance will suffice,—the ravaging of street rail-
way and steam transportation securities through the
advent of the automobile. On the other hand, while
progress cannot be checked, it may be so regulated as
to do a minimum amount of harm in comparison with
the good that it brings. To attempt to shackle business
or progress, even if we could, would dwarf the life of
a community, even as it would have dwarfed the life
of the states years ago, had the rights of individuals
been considered of higher value than those of the com-
munity generally. The truth of this is axiomatic in na-
tional upbuilding. Business in Philadelphia, at one
time, within the memory of living men, ended at Eighth
Street; it is now steadily traveling west. Great office
buildings, huge stores, large financial institutions, with
buildings in keeping, great consolidations occupying
magnificent quarters, within easy reach of this district,
have supplanted the modest structures heretofore
known. Commercial business of a general nature has
followed in their wake, as has the increase of population,
a necessary adjunct of progress. The rise in real estate
values in a neighborhood such as the one here involved,
consequent upon such encroachment, more than compen-
sates landowning plaintiffs for any present loss of com-
fort and convenience; though the reverse of a rise takes

place upon the commercial invasion of any of the classes above mentioned, not bordering on strictly commercial centers. With the former, the damage is largely to the feelings. As for apartment dwellers whose homes are situated therein, a garage may be no more offensive, if it is properly operated, than is the appearance of an apartment house in the first and second classes of residential districts.

There are other reasons. Commercial districts composed of the buildings above mentioned are occupied by persons who live in the outlying residential territory. To reach their offices, motors are used as a transportation facility. A census of those living in office buildings and stores within a radius of a few blocks, of the sort which border on this particular locus in quo, would show an astounding figure. Some have chauffeurs; the majority do not. Shoppers' cars, business autos and trucks occupy the highways. During the day, these machines are parked on the streets, and when the municipality attempts to regulate parking, it meets with a storm of protest. The attempt is abandoned. To give relief in some measure a public garage becomes a necessity, like a hotel or restaurant. It is a business in which the public has an interest. The city cannot compel the garage to go to the outlying districts. If it went to such districts it would meet the same objection as or one even more formidable than that presented in this case, and for the owners of cars to reach them there would further embarrass an already overburdened trolley facility. To withdraw the automobile from the commercial centers by unreasonable regulations, under present-day conditions, would so disrupt business that the harm would immeasurably exceed any possible good. Public garages erected in proper places, under municipal supervision, with proper allocation of cars, will go far toward relieving congestion of traffic. They must be within easy reach and have a rate no higher than what the business may fairly bear; therefore the acquisi-

tion of expensive land in strictly commercial centers is often out of the question.

A public garage in a commercial district is not always to be erected as a matter of right, and, in proper cases, can be controlled by the courts; but the rights of the vast population which use automobiles as a method of transportation must be given some consideration, as well as the right of business to receive the trade which, without hindrance, it has been led to believe it had a right to receive and which it has striven to accommodate. When considering the location of a public garage, the reasons for prohibiting it must be limited in the third type when that district reaches or bears on a commercial center in a rapidly growing city. The place most advantageous for garages is in a section which borders on a commercial district such as that described in this case, and those living in such district must forego a part of their rights, if they can really be called such under the circumstances, in the interest of the many. The noises, gases, etc., described in earlier cases are so minimized that these features are not as noticeable as the travel of cars on this particular highway.

In applying the rules here stated, courts will be careful to note that in small cities and boroughs, business and residence closely interlock, and, in determining the residential character of a locality, of which that considered in Tyson v. Coder, 83 Pa. Superior Ct. 116, is a type, they will be guided by the considerations so well expressed there and preserve the home-dwellers from the intrusion of business which destroys peace, comfort and enjoyment as well as property value. The reasons mentioned as controlling in a city are not to be found in such places.

The matter must now be considered in the light of that class of case described in Pennsylvania Co., etc., v. Sun Co., supra. "Where business is conducted so as to become a nuisance, a different rule prevails. The proof must show that it is conducted in such way as to

become injurious. The injury arises from either an improper conduct of business or one that could be remedied." It is asserted that the business here complained of can be conducted without the usual accompaniments described in our earlier cases. If it cannot, sound-proof walls must be erected. The ventilation device must be of the latest scientific inventions, which, like the smoke eliminator, will free the air of gaseous impurities. No repair facilities may be used in the new addition nor in any part of the structure, to the annoyance of adjoining owners. "The rear of a dwelling is as much entitled to protection as the front": Mitchell v. Guaranty Corp., supra. The owner will so police his building as to prevent unusual disturbance among chauffeurs. Should selling facilities or equipment prove an annoyance when on the street, they must be moved inside. As no complaint is made to the specific construction except as detailed in the facts, the matter of entrance on Latimer Street will not be further discussed. The decree of the court below, where the bill has been retained, will be moulded accordingly.

In cases arising in the district now being specifically dealt with, the decision of the court below will control unless there is an abuse of discretion or a misapplication of our rules to admitted facts.

Decree affrmed, costs here to follow the disposition of costs in the court below.